DL-11-CR-1781 (3)

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

LYLE W. CAYCE
CLERK

TEL. 504-310-7700
600 S. MAESTRI PLACE
NEW ORLEANS, LA 70130

February 21, 2018

FILED

FEB 21 2018

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

Ms. Jeannette Clack
Western District of Texas, Del Rio
United States District Court
111 E. Broadway Street
Room L100
Del Rio, TX 78840-0000

No. 15-51164    USA v. Cristobal Velasquez, et al
USDC No. 2:11-CR-1781-3

Dear Ms. Clack,

Enclosed is a copy of the judgments issued as the mandate as to
Appellants: Cristobal Velasquez; George Sanchez; and Mike Cassiano
**ONLY** and a copy of the court's opinion.

Sincerely,

LYLE W. CAYCE, Clerk

By:_____
Nancy F. Dolly, Deputy Clerk
504-310-7683

cc:  Mr. Joseph H. Gay Jr.
     Mr. Raul Rodriguez
     Mr. George Sanchez
     Mr. Mark Randolph Stelmach
     Mr. Cristobal Velasquez
     Mr. Reginald Van Wade

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

No. 15-51164

---

D.C. Docket No. 2:11-CR-1781-3

United States Court of Appeals
Fifth Circuit

**FILED**

January 30, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

> Plaintiff - Appellee

v.

CRISTOBAL VELASQUEZ, also known as Little Cris,

> Defendant - Appellant

> Appeal from the United States District Court for the
> Western District of Texas

Before STEWART, Chief Judge, and JOLLY and OWEN, Circuit Judges.

## J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

It is ordered and adjudged that the sentence and conviction of the District Court are affirmed.

Certified as a true copy and issued
as the mandate on **Feb 21, 2018**

**Attest:** *Lyle W. Cayce*
**Clerk, U.S. Court of Appeals, Fifth Circuit**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 15-51164

United States Court of Appeals
Fifth Circuit

**FILED**

January 30, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

CRISTOBAL VELASQUEZ, also known as Little Cris; RAUL RODRIGUEZ, also known as Fat Boy; GEORGE SANCHEZ, also known as Curious; MIKE CASSIANO,

Defendants-Appellants.

Appeals from the United States District Court
for the Western District of Texas

Before STEWART, Chief Judge, and JOLLY and OWEN, Circuit Judges.

PER CURIAM:

This appeal arises from the convictions of Defendants-Appellants Cristobal Velasquez, also known as Little Chris ("Velasquez"), Raul Rodriguez, also known as Fat Boy ("Rodriguez"), George Sanchez, also known as Curious ("Sanchez"), and Mike Cassiano ("Cassiano") (collectively, "Defendants") because of their involvement in racketeering activities centrally involving violence, murder, and the distribution of drugs on behalf of the Texas Syndicate gang in Uvalde, Texas. Defendants-Appellants challenge on appeal, jointly and individually, a number of issues concerning their trials, convictions, and sentences. Defendants' arguments do not convince this court that their

No. 15-51164

convictions and sentences should be overturned. For the reasons set forth below, we AFFIRM Defendants-Appellants' convictions and sentences.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Factual Background from the Evidence Presented

At both trials,[1] the evidence presented described the overall structure of the Texas Syndicate gang in Uvalde, Texas, specific instances of violent conduct including three different murders, and drug distribution activity involving Defendants.[2]

### 1. General Information Presented About the Texas Syndicate

The Texas Syndicate was spawned in the California prison system in the late 1970s by Texas inmates. The Texas Syndicate's presence has now spilled over to prisons throughout the United States, and to the Texas cities of Houston, Hondo, Dallas, Austin, Seguin, Uvalde, San Antonio, Belton, Corpus Christi, McAllen, and Brownsville. The gang is referenced by its members in various ways that play on the letters "T" and "S" – *Ese Te*, *Tejano Style*, *Sindicato Tejano*. Texas Syndicate members also refer to themselves as the *cuernos*, which is Spanish for "horns."

Chapters of the Texas Syndicate exist in different prisons and cities. Each chapter operates under the Texas Syndicate umbrella, but is autonomously led by the respective Texas Syndicate leadership of the chapter. If a member moves to a different chapter, he has to be cleared by the prison or

---

[1] Two different jury trials are relevant to this appeal. In the first trial, a jury returned guilty verdicts as to Velasquez, Rodriguez, and Cassiano for all of the charges against them. During the first trial, Sanchez was severed from Velasquez, Rodriguez, and Cassiano to be retried separately at a later date. At Sanchez's trial, a jury found Sanchez guilty of all the charges against him.

[2] This court describes the facts as presented at Defendants' trials viewing them in the light most favorable to the verdicts, as we must. *See United States v. Zamora*, 661 F.3d 200, 209 (5th Cir. 2011).

2

No. 15-51164

city that he has moved to before he can continue to participate in Texas Syndicate business. This process, resembling a background check, is called "running the lights."

Texas-born Mexican-American males are the predominant members of the Texas Syndicate. One of the rules in the Texas Syndicate constitution, or *reglas del ese te*, is that "to become a cuerno you must be a Tejano/Mexicano." Other *reglas del ese te* provisions that crowd upon the facts of this case include:

- Once you become a cuerno del ese te you must put the copia on . . . (revised – not anymore your choice) [sic];
- Once you become a cuerno del ese te you must know its por vida . . . (no way out) [sic];
- A cuerno del ese te will come first in everything, there will be no excuses – no one, friends, homies, cousins, blood family or god will come before el ese te [sic];
- All decisions will be made by majoria, every cuerno has the right to vote . . . [sic];
- When a cuerno requests a vote to be taken for someone to enter el ese te and that person becomes a cuerno then the cuerno sponsoring him (the new cuerno) will be responsible for him, be careful whom you recruit . . . [sic];
- If there's any deals with drugs, money, or any type of profit, we will share with the cuernos, if you use your personal money you get your money back first make sure you tell the cuernos what your doing so there won't be no misunderstandings . . . [sic]; and
- Every prospect will be investigated throughout the system and where ever there are cuernos [sic].

Each Texas Syndicate chapter is led by a top *carnal*, essentially acting as the chairman of the chapter, called a *sillon*. One is not a full member of the Texas Syndicate until he is a *carnal* and an individual has to be a prospect for a probationary period of one to three years before becoming a *carnal*. The *sillon* is followed in rank by a lieutenant, sergeant, representative, treasurer, *carnal*,

No. 15-51164

and prospect. To become a member, an individual must be sponsored and recruited by a current member in good standing, who will serve as that individual's *padrin*o or godfather.

After becoming a Texas Syndicate member by unanimous vote of the chapter, that individual is a Texas Syndicate member for life and permitted to participate in all Texas Syndicate business and privileges. Membership includes the ability to vote at Texas Syndicate meetings. Only a Texas Syndicate member is permitted to pose as a Texas Syndicate member with other members in photographs. At trial, testimony revealed that Texas Syndicate chapters frequently disseminate group pictures to one another with the members' names on the back of the photographs to keep track of the different members across the Texas Syndicate organization. An additional rite of passage to becoming a member is getting the Texas Syndicate *copia*, which is a tattoo showing allegiance to the gang. The prototypical *copia* to signify Texas Syndicate membership is a stacked, intertwined "TS." If someone has the Texas Syndicate tattoo without actually being a member, he could be killed. Other forms of tattoos signifying membership span from the plain spelling of the words "Texas Syndicate" or "cuernos" to depictions of horns, longhorns, a serpent shaped in the letter "S," the University of Texas's longhorn logo, and the NFL team Houston Texans's logo.

### 2. *Defendants' Alleged Participation in the Conspiracy*

Facing the prospect of jury trials, eleven of the fifteen indicted co-conspirators pled guilty. The four individuals who did not plead guilty are Defendants. Some of the co-conspirators became Government witnesses to

No. 15-51164

testify against Defendants.[3] At both trials, the co-conspirators testified that they could be killed for testifying against another Texas Syndicate member.

Testimony from trial revealed that Velasquez, Rodriguez, Sanchez, and Cassiano are members of the Texas Syndicate in Uvalde and began their membership in the late 1990s or early 2000s. Rodriguez, Cassiano, and Sanchez also served as *padrinos* for prospects. At different points from January 2002 to September 2011, Defendants were stated to have actively participated in selling and distributing cocaine on behalf of the Texas Syndicate. Ervey testified that on one occasion he was commissioned by his *padrino*, Sanchez, to pick up a kilogram of cocaine for Sanchez behind a movie theater. The cocaine had a street value of $24,000. After Ervey brought the cocaine to Sanchez's house, Sanchez took Ervey to Sanchez's brother-in-law's house to break down the cocaine. Sanchez compensated Ervey in cocaine for picking up the drugs.

### 3. Rogelio Mata ("Mata") Murder; October 2002

In October 2002, Rodriguez, Sanchez, and other Texas Syndicate members were said to have voted at a Texas Syndicate meeting to have fellow Texas Syndicate member, Mata, murdered. Mata owed a drug debt to another Texas Syndicate chapter. Because Mata was a member in the Uvalde chapter, the Uvalde chapter was responsible for him. Testimony at both trials from members who claimed that they were at the meeting, indicated that the vote in favor of killing Mata was at least seven out of eight votes, and that Rodriguez and Sanchez voted "yes" to kill Mata.

Rodriguez and his brother John Rodriguez ("John"), also a Texas Syndicate member, volunteered to execute the murder. After the vote was

---

[3] Charles Esparza ("Esparza"), Jose Torres ("Torres"), Ervey Sanchez ("Ervey"), Inez Mata ("Inez"), and Larry Munoz.

No. 15-51164

conducted, the members took a photograph to memorialize the meeting. Rodriguez, John, and Sanchez were in the photograph.

On October 13, 2002, in the early evening, Rodriguez and John picked up Mata in John's truck. Later that night, Mata's body was found in a grassy bar ditch next to a highway two miles west of Uvalde. Mata had gunshot wounds to his chest and head. John was said to have shot Mata with Rodriguez in attendance. Testimony at trial revealed that Rodriguez and John then went to their uncle's house, who was also a Texas Syndicate member, to clean the gun John used by placing it in a bucket of bleach.

The Uvalde County Sheriff's Department collected an empty beer bottle at the scene where Mata's body was found. A DNA test conducted in 2004 indicated that the DNA on the bottle could not have come from Mata or John. The partial DNA profile results, however, could not eliminate Rodriguez as being the source of the DNA obtained from the bottle.[4]

*4. Jose De La Garza ("De La Garza") Murder; December 2005*

In 2005, Cassiano was the acting *sillon* in Uvalde. During this era, the Texas Syndicate members were said to be Cassiano's "enforcers." In December 2005, Cassiano's roommate had a radio stolen from his vehicle. De La Garza purchased the stolen radio and would not return it. De La Garza's failure to return the radio caused a problem with Cassiano.

After a series of retaliatory acts, Cassiano began to push for De La Garza's murder. Cassiano then gathered enough votes from Texas Syndicate members to seal De La Garza's fate.

---

[4] Rodriguez was incarcerated in December 2002 for a drug offense, and his incarceration continued for the remainder of the time that the alleged conspiracy took place.

No. 15-51164

On Christmas Eve 2005, Cassiano, Velasquez, Cassiano's prospect Jesse James Polanco ("Polanco"), Caleb Velasquez ("Caleb") and Josue Velasquez ("Josue"), approached Mexican Mafia member Orlando Guerrero ("Guerrero") at a bar in Uvalde. Guerrero testified at trial that since the Mexican Mafia and Texas Syndicate have a peace treaty agreeing to settle disputes in house and not inflict violence on each other's members, Cassiano was doing his due diligence to make sure that De La Garza was not a Mexican Mafia member. Guerrero subsequently notified Cassiano that De La Garza was not a Mexican Mafia member. That night, testimony unveiled that Cassiano was with Caleb, Josue, and a woman who works in the bail bonds business inquiring about the possibility of the bail bonds woman bailing someone out of jail if there was an arrest.

The next night, after leaving Cassiano's house, Polanco drove Cassiano's truck with Velasquez, Caleb, and Josue to De La Garza's home. The group forced their way into the home and Velasquez began beating De La Garza. While Velasquez beat De La Garza, Caleb shot De La Garza in the chest and forearm, killing De La Garza. Velasquez was inadvertently shot in the leg during the incident.

Velasquez, Caleb, Josue, and Polanco were subsequently arrested because of their suspected connection to the De La Garza murder. Velasquez pled guilty to aggravated assault of De La Garza in state court in 2007, and Caleb, and Josue were convicted of the murder of De La Garza in state court. Polanco, however, only received probation and was released. Cassiano was also arrested around this time because of a drug related offense.[5]

---

[5] Cassiano pled guilty to conspiracy to possess with intent to distribute cocaine in December 2008.

7

No. 15-51164

### 5. Polanco Murder; November 2009

During his incarceration, Cassiano began to believe that his prospect, Polanco, was a confidential informant. Cassiano began to push for Polanco's murder from jail. Testimony presented at the trial stated that Cassiano made calls from a smuggled cell phone and sent correspondence to other Texas Syndicate members by mail from prison, pushing for the killing of Polanco.

In November 2009, Sotero Rodriguez Martinez ("Martinez"), the *sillon* in Uvalde at the time, approached Texas Syndicate prospect Ervey stating that Cassiano continued to push for the murder of Polanco. Martinez told Ervey that he wanted him to execute the murder. A couple of months before this discussion, Ervey testified that his *padrino*, Sanchez, stated he might ask him "to do something that [he] could get life in prison or the needle" for doing.

On November 9, 2009, Ervey went to Polanco's house in the early morning, and once Polanco opened the door, Ervey shot Polanco in the chest two times. Ervey additionally shot Polanco in the face to ensure his death. Ervey stated that the killing was completely directed by the Texas Syndicate.

### 6. FBI Investigation; December 2009 to September 2011

In December 2009, the FBI began to conduct an investigation of the Texas Syndicate in Uvalde. The purpose of the investigation was to obtain information regarding drug trafficking and violent activity conducted by the Texas Syndicate, and to investigate unsolved murders in the Uvalde area. The investigation was conducted until September 2011. Based on a tip from a wiretap, an individual was intercepted transporting marijuana for the Texas Syndicate from Hondo to Uvalde. An undercover FBI agent additionally purchased crystal methamphetamine and cocaine from Texas Syndicate prospects in Uvalde. In April 2010, Rodriguez was recorded clearing Uvalde Texas Syndicate members for the "running the lights" process from prison. A

No. 15-51164

recording from an August 2010 meeting concerning Texas Syndicate business included references to "Fat Boy," which the FBI believed to be a reference to Rodriguez. At this meeting, a meeting which Sanchez and Velasquez attended, Texas Syndicate members discussed possibly killing Ramon Rodriguez ("Spider"), a member of a rival gang known as the TSO. Ervey was also made a full member at this meeting. Sanchez, Ervey's *padrino*, welcomed him to the gang after a vote.

### 7. *Additional Signs of Defendants' Texas Syndicate Membership*

In September 2011, a series of search warrants were executed on the residences of alleged Texas Syndicate members in Uvalde, including Sanchez's and Velasquez's residences. During a search of the Texas Syndicate sergeant Eli Torres's ("Eli") home, a composition book was found in a drawer in his bedroom with names and positions of the Texas Syndicate members in Uvalde at the time. The word "Rep." was next to "George Sanchez Aka Curious" and a "c/" which was said to signify carnal was next to "Chris Velasquez Aka Lil Chris." Rodriguez and Cassiano's names did not appear in the book.

The Government offered evidence at both trials to show that the tattoos of Rodriguez, Cassiano, Sanchez, and Velasquez signified their membership. Rodriguez has intertwined "TS" tattoos on his arms, the word "cuerno" on the front of his neck, the word "Texas" across the back of his neck, a cow's skull with horns on his upper chest, a longhorn under his eye, a longhorn skull with horns and a serpent protruding out of it on his hand, and a horn tattoo on the side of his head. Cassiano has tattoos of a picture of a woman who has a shirt with a longhorn on it and has the word "Texas" going across her stomach, the Houston Texans's logo on the front of his neck, and the words "Texas Syndicate" on the side of his neck. Cassiano also has tattoos of a man with horns on his back, the words "Texas" with a longhorn depiction on his stomach,

No. 15-51164

and the intertwined "TS" on his forearm and leg. An intertwined "TS" tattoo is on the left forearm of Sanchez. Velasquez has a picture of a serpent shaped in the letter "S" on his upper arms, and a longhorn skull on his upper back, lower neck area.

**B. Procedural History**

On September 29, 2011, a grand jury in the Western District of Texas indicted Rodriguez, Cassiano, Velasquez, Sanchez, and eleven other co-conspirators. All of the conspirators were charged with conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d). Rodriguez was charged with the murder of Mata, in aid of racketeering, in violation of the Violent Crimes in Aid of Racketeering Act ("VICAR"), 18 U.S.C. §§ 1959(a)(1)&(2). Velasquez and Cassiano were charged with conspiracy to commit the murder of De La Garza, in aid of racketeering, in violation of VICAR, 18 U.S.C. § 1959(a)(5). Velasquez was charged with the murder of De La Garza in aid of racketeering, in violation of VICAR, 18 U.S.C. §§ 1959(a)(1)&(2). Cassiano was additionally charged with conspiracy to commit the murder of Polanco, in aid of racketeering, in violation of VICAR, 18 U.S.C. § 1959(a)(5). In a Second Superseding Indictment, Sanchez was charged with conspiracy to violate RICO, 18 U.S.C. § 1962(d), conspiracy to commit the murder of Mata, in aid of racketeering, in violation of VICAR, 18 U.S.C. § 1959(a)(5), and the murder of Mata, in aid of racketeering, in violation of VICAR, 18 U.S.C. § 1959(a)(1).

Two separate week-long trials ensued. At the first trial, a jury returned guilty verdicts for Velasquez, Rodriguez, and Cassiano for all of the charges against them. On day four of the first trial, Sanchez was severed from the trial of the rest of Defendants to be separately retried at a later date. At the second trial, a jury found Sanchez guilty of all the charges against him. Defendants

No. 15-51164

were each sentenced to a term of life imprisonment.[6] Defendants now appeal their convictions and sentences asserting over ten grounds for reversal. None are persuasive.

## II.   DISCUSSION

We will first consider whether the Government submitted sufficient evidence during the trials to support Defendants' convictions. In a variety of ways, Defendants assert that there is insufficient evidence to support certain elements of their convictions.[7] Defendants also make arguments that this court should discredit the evidence presented by the co-conspirators. Defendants' arguments in this vein are unconvincing. Generally, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam). "[It is] within the sole province of the jury as the fact finder to decide the credibility of the witnesses and to choose among reasonable constructions of evidence." *United States v. Zuniga*, 18 F.3d 1254, 1260 (5th Cir. 1994) (citation

---

[6] Velasquez was sentenced to a term of life imprisonment for his convictions for violating RICO, § 1962(d) and the murder of De La Garza in violation of VICAR, § 1959(a)(1)&(2), and 120 months for conspiring to commit the murder of De La Garza in violation of VICAR, § 1959(a)(5). Cassiano was sentenced to a term of life imprisonment for violating RICO, § 1962(d), and 120 months for conspiring to commit the murders of De La Garza and Polanco in violation of VICAR, § 1959(a)(5). Rodriguez was sentenced to a term of life imprisonment for violating RICO, § 1962(d) and for the murder of Mata in violation of VICAR, § 1959(a)(1)&(2). Sanchez was sentenced to a term of life imprisonment for violating RICO, § 1962(d) and for the murder of Mata in violation of VICAR, § 1959(a)(1)&(2), and 120 months for conspiracy to commit the murder of Mata in violation of VICAR, § 1959(a)(5).

[7] Although Defendants have adopted the arguments raised by other Defendants in their briefs, a sufficiency of the evidence challenge is fact-specific. Accordingly, Defendants should not be permitted to adopt sufficiency of the evidence challenges brought by other Defendants. *See United States v. Stephens*, 571 F.3d 401, 404 n.2 (5th Cir. 2009) ("[S]ufficiency of the evidence challenges are fact-specific, so we will not allow the appellant to adopt those arguments." (quotation marks and citation omitted)).

No. 15-51164

omitted). We decline Defendants' invitation to discredit the co-conspirators'
testimony.

## A. Sufficiency of the Evidence to Support Defendants' Convictions

### 1. Standard of Review

Because Defendants moved for acquittal at trial, this court's review of
whether sufficient evidence was presented to support Defendants' convictions
is de novo but "highly deferential to the verdict." *United States v. Beacham*,
774 F.3d 267, 272 (5th Cir. 2014) (quoting *United States v. Isgar*, 739 F.3d 829,
835 (5th Cir. 2014)). "When reviewing the sufficiency of the evidence, a court
must determine whether *any* rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt." *United States v.
Umawa Oke Im*o, 739 F.3d 228, 235 (5th Cir. 2014) (quoting *United States v.
Moreno-Gonzalez*, 662 F.3d 369, 372 (5th Cir. 2011)). Courts are to "accept all
credibility choices and reasonable inferences made by the trier of fact which
tend to support the verdict." *Moreno-Gonzalez*, 662 F.3d at 372 (quotation
marks omitted). "The jury retains the sole authority to weigh any conflicting
evidence and to evaluate the credibility of the witnesses." *United States v.
Grant*, 683 F.3d 639, 642 (5th Cir. 2012) (quotation marks omitted). Any
conflict in the evidence must be resolved in favor of the verdict. *Umawa Oke
Imo*, 739 F.3d at 235.

### 2. Applicable Law and Analysis

#### a.      Substantive RICO Violation: 18 U.S.C. § 1962(c)

Section 1962(c) is the underlying substantive violation that drives
Defendants' RICO, § 1962(d) convictions. *See United States v. Delgado*, 401
F.3d 290, 296 (5th Cir. 2005). Defendants were convicted under § 1962(d)
because of their violation of the substantive RICO provision, § 1962(c). To
establish a § 1962(c) violation, the "[G]overnment must prove (1) the existence

12

No. 15-51164

of an enterprise that affects interstate or foreign commerce, (2) that the
defendant was employed by or associated with the enterprise, (3) that the
defendant participated in the conduct of the enterprise's affairs, and (4) that
the participation was through a pattern of racketeering activity." *Id.* at 297
(quotation marks omitted).

### i. *Enterprise that Affects Interstate or Foreign Commerce*

Cassiano argues that the Government failed to prove that the Texas
Syndicate enterprise was engaged in activities that affected interstate *and*
foreign commerce. Cassiano bases this argument on the fact that the
indictment alleges § 1962(c) conjunctively, stating that the Texas Syndicate
affected interstate *and* foreign commerce. This argument is misguided. "[A]
disjunctive statute," such as § 1962(c), "may be pleaded conjunctively and
proved disjunctively." *United States v. Dickey*, 102 F.3d 157, 164 n.8 (5th Cir.
1996) (quoting *United States v. Johnson*, 87 F.3d 133, 136 n.2 (5th Cir. 1996))
(quotation marks omitted). Therefore, the jury finding that Cassiano was
associated with the Texas Syndicate enterprise that was engaged in activities
that affected interstate or foreign commerce does not support reversal of
Cassiano's convictions. Moreover, the district court's charge to the jury closely
tracked the Fifth Circuit's Pattern Jury Instructions with no objections from
Defendants, which only requires that the alleged RICO activity affect
"interstate *or* foreign commerce." *See* Pattern Crim. Jury Instr. 5th Cir. 2.79
(2015) (emphasis added).

To establish the existence of a RICO "enterprise" the Government must
present evidence of "an ongoing organization, formal or informal, and . . . that
the various associates function as a continuing unit." *United States v. Jones*,
873 F.3d 482, 490 (5th Cir. 2017) (quotation marks omitted). A jury may infer
the existence of a RICO enterprise by considering largely or wholly

13

No. 15-51164

circumstantial evidence. *Id.* Witness testimony that states that the enterprise is involved in distributing and acquiring drugs produced in Colombia and shipped to the United States via Mexico shows that the enterprise is affecting interstate commerce. *Delgado*, 401 F.3d at 297. Use of instrumentalities of interstate commerce such as telephones, the U.S. Postal Service, and pagers to communicate in furtherance of the enterprise's criminal purposes can also constitute the enterprise affecting interstate commerce. *Id.*

At both trials, evidence was presented that the Texas Syndicate is an organized crime group with a para-military structure that distributes drugs and conducts violent acts. Numerous members of the Texas Syndicate testified that they, and Defendants, sold drugs while they were Texas Syndicate members. Indeed, one of the *reglas del ese te* provides, "[i]f there's any deals with drugs, money, or any type of profit, we will share with the cuernos." Enough evidence was presented to show that the Texas Syndicate is an "enterprise" under RICO. *See Jones*, 873 F.3d at 490.

Evidence presented that many of the Texas Syndicate's communications occurred over the telephone or by mail. *See Delgado*, 401 F.3d at 297. Texas Syndicate members communicated to each other inside and outside of prison using ghost letters and other forms of correspondence. Cassiano in particular was said to have pushed for the murder of Polanco while he was in prison by using a smuggled cell phone. Witnesses testified that the Texas Syndicate was involved in distributing and acquiring drugs mainly produced in Colombia that predominantly arrived in the United States via smuggling from Mexico. *See Delgado*, 401 F.3d at 297 (citing *R.A.G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350, 1353 (5th Cir. 1985); *United States v. Pipkins,* 378 F.3d 1281 (11th Cir. 2004)). The Government firmly established that the Texas Syndicate affected interstate commerce or foreign commerce. Thus, the Government presented

14

No. 15-51164

sufficient evidence to establish the "existence of an enterprise that affects interstate or foreign commerce."

### ii.  Employed by or Associated with the Enterprise

Cassiano argues that the Government failed to prove that he was a member of the Texas Syndicate. For a defendant to be employed by or associated with the criminal enterprise, a defendant need not have committed or agreed to commit the two predicate acts. *Id.* at 296–98. The conspirator need only have known of and agreed to the overall objective of the RICO offense. *Salinas v. United States*, 522 U.S. 52, 61–65 (1997).

The evidence presented pointed to the membership of Defendants, including Cassiano. Texas Syndicate members and co-conspirators testified that Cassiano was indeed the acting *sillon* of the Texas Syndicate in Uvalde in 2005. Evidence at the trial unveiled that Cassiano pushed for the murders of both De La Garza and Polanco on behalf of the Texas Syndicate and that he participated in drug dealing on behalf of the Texas Syndicate. Cassiano's and Defendants' tattoos were also indicative of Texas Syndicate membership.

### iii.  Participated in the Conduct of the Enterprise's Affairs

There was sufficient evidence presented that Defendants participated in the conduct of the Texas Syndicate's affairs. For a defendant to have "participated in the conduct of the enterprise's affairs," the "defendant must have participated in the operation or management of the enterprise itself." *United States v. Herrera*, 466 F. App'x 409, 418–19 (5th Cir. 2012) (per curiam) (unpublished) (quotation marks omitted). An enterprise can be operated by upper management and by lower rung participants under the direction of upper management. *Id.*

Inez, Torres, Esparza, Guerrero, and Ervey all testified that Cassiano has been a member in the Texas Syndicate since the early 2000s. Additionally,

15

No. 15-51164

it would be reasonable for a jury to believe that the only reason Cassiano and Rodriguez were not in the composition book found in Eli's home was because Cassiano and Rodriguez were incarcerated at the time the list of the members in the book was composed. Additionally, evidence was presented that Rodriguez was a member of the Texas Syndicate. Inez, Esparza, and Torres all testified that Rodriguez was a Texas Syndicate member in the early 2000s. There was also evidence presented that Rodriguez volunteered to execute the murder of Mata. Furthermore, in April 2010, Rodriguez was recorded participating in Texas Syndicate business over a phone from prison.

Testimony at trial indicated that Velasquez distributed cocaine and participated in the murder of De La Garza on behalf of the Texas Syndicate. Velasquez was known to sell cocaine and often aid in breaking up bricks of cocaine for the Texas Syndicate. Torres, and evidence of FBI surveillance presented during trial, also related that Velasquez was present at a Texas Syndicate meeting in August 2010 where Texas Syndicate business was discussed.

In Sanchez's trial, Esparza and Inez stated that Sanchez was at the meeting and voted affirmatively to kill Mata. Evidence was also presented to show Sanchez was at a meeting in August 2010 where Texas Syndicate business was discussed. Additional evidence pointed towards Sanchez distributing cocaine and supporting other violent acts connected to the Texas Syndicate. There is sufficient evidence that Defendants participated in the operation or management of the RICO enterprise. *See id.*

> iv. *Participation Through a Pattern of Racketeering Activity*

The Government additionally established a pattern of racketeering activity to support Defendants' violations of § 1962(c). To show the existence of "a pattern of racketeering activity," the Government must establish that the

16

No. 15-51164

racketeering acts are related, and that they amount to or pose a threat of
continued criminal activity. *Delgado*, 401 F.3d at 298. A pattern of
racketeering is established if at least two predicate acts of racketeering activity
are conducted. *Hererra*, 466 F. App'x at 419. "Racketeering activity" includes
any act or threat involving murder, conspiring to commit murder, or
distributing, buying, or selling cocaine. 18 U.S.C. §§ 1959(b)(1), 1961(1).

Evidence presented at both trials supported that the racketeering acts of
murder, conspiracy to commit murder, and the distribution of cocaine were all
committed by Defendants in furtherance of Texas Syndicate business. Sanchez
argues that all of these acts occurred independently and were not connected to
the Texas Syndicate. The presentation of the evidence showed differently. Inez
stated that the killing of Mata was done on behalf of the Texas Syndicate. The
murder of De La Garza was said to be done on behalf of the Texas Syndicate.
Ervey maintained that he also was ordered to kill Polanco for the Texas
Syndicate. The distribution of cocaine was additionally said to be Texas
Syndicate business. On one occasion Ervey was said to be commissioned by his
*padrino*, Sanchez, to pick up a kilogram of cocaine from behind a movie theater
that had a street value of approximately $24,000. The number and frequency
of predicate acts that were said to occur from the time of January 2002 until
September 2011 is sufficient evidence of these acts continuing in the future.
*See Delgado*, 401 F.3d at 298.

In conclusion, there was sufficient evidence presented to support that
each of Defendants violated the § 1962(c) substantive RICO provision.

>    b.      *RICO Conspiracy Offense: 18 U.S.C. § 1962(d)*

Sanchez and Velasquez argue that they neither knew of nor agreed to
the overall objective of the RICO offense. Cassiano additionally argues that he
committed no "overt acts" to prove that he was in fact a part of the conspiracy.

17

No. 15-51164

The Government presented sufficient evidence for the jury to come to the conclusion that Sanchez, Velasquez, Cassiano, and Rodriguez should each be convicted for being a part of the RICO conspiracy under § 1962(d).

Under § 1962(d), RICO criminalizes conspiracy to violate any of its substantive provisions. To prove a conspiracy, the Government must establish that (1) two or more people agreed to commit a substantive RICO offense, and (2) the defendants knew of and agreed to the overall objective of the RICO offense. *Id.* at 296.   These requirements may be met by circumstantial evidence. *Id.* Unlike § 1962(c), which requires a showing of two predicate acts constituting a "pattern of racketeering activity," a § 1962(d) conspirator "need not have committed or agreed to commit . . . two predicate acts." *Id.* Instead, the conspirator "need only have known of and agreed to the overall objective of the RICO offense." *Id.* Put differently, if conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, then the supporters are as guilty as the perpetrators. *See id.*

Evidence presented at the trials showed that the Texas Syndicate had numerous members, including Defendants. There is also evidence that Defendants agreed to the overall objective of the Texas Syndicate committing the RICO offense. Defendants participated in meetings and decisions to murder individuals and to distribute drugs. *See id.* Cassiano's argument that he did not commit any "overt acts" to be a part of the conspiracy is baseless because an individual only need to have known of and agreed to the overall objective of the RICO offense. Sanchez's and Velasquez's arguments that they neither knew of nor agreed to the overall objective of the RICO offense similarly fall short because ample evidence was presented to the contrary. There is sufficient evidence to support that Defendants knew of and agreed to

18

No. 15-51164

the overall objective of the Texas Syndicate committing the RICO offense to support their § 1962(d) convictions.

        *c.*      *VICAR Offense: 18 U.S.C. § 1959(a)*

Defendants were also convicted for violating § 1959(a) for murder and conspiracy to commit murder in aid of racketeering. Particularly, Sanchez murdered and conspired to murder Mata, Rodriguez murdered and conspired to murder Mata, Velasquez murdered and conspired to murder De La Garza, and Cassiano conspired to murder De La Garza and Polanco, in violation of Texas's murder and conspiracy to commit murder statutes, §§ 15.02, 19.02 of the Texas Penal Code, and VICAR, § 1959. V.T.C.A., Penal Code §§ 15.02, 19.02; 18 U.S.C. § 1959. Defendants contend that there was insufficient evidence to prove their § 1959(a) convictions.

To establish that Defendants have violated VICAR, the Government must show that (1) an enterprise existed; (2) the enterprise engaged in, or its activities affected, interstate commerce; (3) it was engaged in racketeering activity; (4) Defendants committed violent crimes; and (5) Defendants committed the violent crimes to gain entrance to, or to maintain or increase, their position in the enterprise. *Jones*, 873 F.3d at 492. A person who "aids, abets, counsels, commands, induces or procures" the commission of a federal offense "is punishable as a principal." 18 U.S.C. § 2. In determining whether a "murder was carried out for the purpose of . . . maintaining or increasing position in a racketeering enterprise, self-promotion need not be the defendant's sole or primary concern." *United States v. Hinojosa*, 463 F. App'x 432, 449–50 (5th Cir. 2012) (per curiam) (unpublished) (quotation marks and alterations omitted)).

A VICAR "enterprise" is any "partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact

No. 15-51164

although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce."[8] 18 U.S.C. § 1959(b)(2). Because the foregoing section of this opinion demonstrated that there is sufficient evidence to establish that the Texas Syndicate was an "enterprise" that "affected interstate commerce or foreign commerce" engaged in "racketeering activity," this section will focus on whether there is sufficient evidence to show Defendants either committed or conspired to commit the murders, to gain entrance to, or to maintain or increase their positions in the enterprise. *See Jones*, 873 F.3d at 492.

There is sufficient evidence to support Rodriguez's conviction for the murder of Mata in aid of racketeering. Testimony during trial revealed that the Uvalde chapter was responsible for Mata and conducted a vote to determine whether to kill Mata since Mata owed a drug debt. Inez testified that Rodriguez voted "yes" and volunteered to conduct the killing of Mata on behalf of the Texas Syndicate. Rodriguez and John then were said to have picked up Mata in John's truck on the night of the murder. Evidence from testimony during the trial, and DNA analysis, showed that a reasonable jury could find Rodriguez was present when John shot Mata. Rodriguez and John were then said to go to their uncle's house after killing Mata to clean the gun in a bucket of bleach. All of the evidence presented pointed to Rodriguez being with John and aiding John before, during, and after the killing of Mata. Since this murder was committed on behalf of the Texas Syndicate, there is sufficient evidence that Rodriguez participated in the murder to maintain or increase his

---

[8] Courts treat the RICO and VICAR definition of "enterprise," and what is necessary to establish an "enterprise," identically. *See Hinojosa*, 463 F. App'x at 449 n.9.

No. 15-51164

position with the Texas Syndicate enterprise. The Government met its burden to prove Rodriguez's § 1959(a) convictions.

There is also sufficient evidence to prove Velasquez's conviction for the murder and conspiracy to commit the murder of De La Garza. Inez, Torres, Esparza, and Ervey all stated that Velasquez was a Texas Syndicate member. Torres and Esparza specifically testified that Velasquez was a Texas Syndicate member at the time of the De La Garza murder. Evidence presented at trial further stated that Velasquez and other Texas Syndicate prospects and members planned the murder of De La Garza on behalf of the Texas Syndicate. Ervey, Torres, and Inez testified that Velasquez was beating De La Garza right before his cousin shot and killed De La Garza. A reasonable inference can also be made from the evidence that because Velasquez was shot in the leg during the incident, he was in close proximity to De La Garza when De La Garza was fatally shot.

Moreover, under Texas law, an individual commits a murder if that person "intentionally or knowingly causes the death of an individual," or "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." V.T.C.A., Penal Code § 19.02. A person is criminally responsible for a criminal offense committed by another if, acting with intent to promote or assist the commission of the offense, he encourages, directs, aids, or attempts to aid the other person. *Id.* § 7.02. Since this murder was committed on behalf of the Texas Syndicate, there is adequate evidence to show that this murder of De La Garza was committed for Velasquez to maintain or increase his position in the Texas Syndicate. There is sufficient evidence for Velasquez's § 1959(a) convictions.

Cassiano's § 1959(a) conviction for conspiracy to commit murder in aid of racketeering was also founded upon sufficient evidence. Cassiano argues

21

No. 15-51164

that there is insufficient evidence because the Government failed to prove that he committed any "overt acts." Evidence was presented that Cassiano pushed for the murders of Polanco and De La Garza. Cassiano was said to have gathered enough votes to have De La Garza killed on behalf of the Texas Syndicate. Cassiano was also said to have conducted due diligence for the murder making sure that De La Garza was not a Mexican Mafia member. In prison, Cassiano was said to have pushed for the murder of Polanco by making phone calls from a smuggled cell phone and sending "paper work" to other Texas Syndicate members to prove Polanco was an informant. There is sufficient evidence to support Cassiano's § 1959(a) convictions.

Based on the evidence presented at Sanchez's trial, there is sufficient evidence to support his § 1959(a) convictions. Sanchez argues his § 1959(a) convictions should not stand because there was no evidence presented that he committed any voluntary act to bring about the demise of Mata and that he shared no intent to commit Mata's murder. Despite Sanchez's argument, the Government presented sufficient evidence to uphold his convictions.

Inez and Esparza both testified that they were present at the meeting when Sanchez voted to kill Mata. Despite slight inconsistencies in the testimonies of Inez and Esparza, a reasonable jury could still find Sanchez guilty beyond a reasonable doubt. Two accounts of Inez's recollection of the events were read into the record during Sanchez's trial—one from when Inez testified in the first trial, and another from when Inez was deposed in the hospital shortly before his death from a terminal disease. In the testimony from the first trial, Inez stated that Sanchez was at the meeting and voted "yes" to kill Mata. Inez also said that there was a seven out of eight vote, with Inez's vote being the only vote not to kill his cousin. In a later deposition, Inez consistently stated that Sanchez was at the meeting to vote for whether Mata

22

No. 15-51164

should be killed. However, when asked about whether Sanchez voted to kill Mata, Inez said, "I don't remember. I don't remember if he killed, but he was there." Similar to both of Inez's accounts, Esparza testified that Sanchez was at the meeting where Texas Syndicate members voted to kill Mata. Esparza additionally stated that Sanchez and all of the members at the meeting voted "yes." While there were inconsistencies in the testimony, "[t]he jury retains the sole authority to weigh any conflicting evidence and to evaluate the credibility of the witnesses." *Grant*, 683 F.3d at 642 (quotation marks omitted).

Additionally, witnesses testified against Sanchez as to the purpose of the murder and stated that the murder of Mata was Texas Syndicate business. The killing was said to be on behalf of the Texas Syndicate because Mata owed a drug debt to another Texas Syndicate chapter. The jury acted reasonably in weighing the credibility of the witnesses and concluding that Sanchez voted to have Mata killed as a means to maintain his position in the Texas Syndicate. *See Hinojosa*, 463 F. App'x at 450 ("self-promotion need not be the defendant's sole or primary purpose"). Accordingly, there was sufficient evidence presented to support Sanchez's § 1959(a) convictions.

In sum, sufficient evidence was presented to support Defendants' RICO, § 1962(d), and VICAR, § 1959(a), convictions.

**B. Tattoo Evidence**

Defendants argue that evidence presented at both trials relating to their tattoos warrants a reversal of their convictions. Cassiano, Velasquez, and Rodriguez first argue that the district court committed reversible error when it required them to remove their shirts during their trial so that the jury could see their tattoos that showed possible Texas Syndicate membership. Before the jury entered the courtroom, the district court required Cassiano, Velasquez, and Rodriguez to remove their shirts so that certain tattoos on their bodies

23

No. 15-51164

could be displayed. Once the jury entered the courtroom, a FBI agent went over to Cassiano, Velasquez, and Rodriguez, who were shirtless, and pointed out which tattoos on their bodies were indicative of Texas Syndicate affiliation.[9] Promptly after the brief demonstration used to identify which tattoos were on Defendants, the district court instructed Defendants to put their shirts back on. All Defendants additionally assert that the Government's presentation of Defendants' tattoos to the juries in both trials violated their Fifth Amendment privilege against self-incrimination. This court will address Defendants' arguments in turn.

### 1. Requiring Defendants to Appear Shirtless in the Jury's Presence

Cassiano, Velasquez, and Rodriguez argue that the district court under Federal Rule of Evidence 403 ("Rule 403") should not have required them to appear shirtless in open court so that FBI Agent Steve Hause ("Agent Hause") could identify which tattoos on their bodies were indicative of Texas Syndicate membership. Defendants additionally argue that this act was demeaning and unnecessary because photographs of Defendants' tattoos had already been admitted into evidence.

The Government argues it was necessary for Defendants to remove their shirts because the jury needed to be able to identify which tattoos from the photographs admitted in evidence belonged to which Defendant. The Government additionally avers that the district court diminished the prejudicial effect of Defendants having to appear shirtless before the jury by

---

[9] At this point in the trial, Sanchez had not been severed from Velasquez, Rodriguez, and Cassiano to be retried separately at a later date. Even though Sanchez had to remove his shirt with Velasquez, Cassiano, and Rodriguez at the first trial, he does not raise this argument as a grounds for reversal of his conviction and sentence due to his subsequent severance and not being required to do remove his shirt again at his later trial.

24

No. 15-51164

instructing the Government to only make Defendants stand up to show their tattoos if necessary.

*a.    Standard of Review*

Because Defendants objected at trial about having to remove their shirts for the jury, this issue will be analyzed for abuse of discretion. *See United States v. Santos*, 589 F.3d 759, 763 (5th Cir. 2009). The admission of demonstrative evidence is within the trial court's sound discretion and will not be disturbed on appeal absent abuse of discretion. *Shipp v. Gen. Motors Corp.*, 750 F.2d 418, 427 (5th Cir. 1985). "A trial court abuses its discretion when it bases its decision on an erroneous view of the law or a clearly erroneous assessment of the evidence." *United States v. Caldwell*, 586 F.3d 338, 341 (5th Cir. 2009). If an abuse of discretion is found, then the court must conduct a harmless error analysis, and affirm unless the error affected Defendants' substantial rights. *United States v. Ragsdale*, 426 F.3d 765, 774–75 (5th Cir. 2005).

*b.    Applicable Law and Analysis*

Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury . . . or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The abuse of discretion standard for a Rule 403 decision is not satisfied "by a mere showing of some alternative means of proof that the prosecution in its broad discretion chose not to rely upon." *Old Chief v. United States*, 519 U.S. 172, 183 n.7 (1997). "A district court's ruling regarding Rule 403 is reviewed with an especially high level of deference to the district court, with reversal called for only rarely and only when there has been a clear abuse of discretion." *United States v. Lewis*, 796 F.3d 543, 545 (5th Cir. 2015) (quoting *United States v. Dillon*, 532 F.3d

25

No. 15-51164

379, 387 (5th Cir. 2008) (quotation marks omitted)). Evidence which tends to rebut a defendant's claim of innocence is unlikely to be unduly prejudicial. *United States v. El-Mezain*, 664 F.3d 467, 509 (5th Cir. 2011).

Importantly, requiring Defendants to appear shirtless in the presence of the jury created the risk of unfair prejudice. Other avenues seemed available to achieve the Government's objective of showing the jury that the tattoos in the photographs belonged to Cassiano, Rodriguez, and Velasquez – say, showing the jury the tattoo photographs already admitted into evidence, or having someone identify through trial testimony which tattoo belonged to which Defendant, or both.

However, the danger of unfair prejudice and cumulative manner of presenting the tattoo evidence did not substantially outweigh the probative value of presenting this evidence to the jury to amount to an abuse of discretion by the district court. "Within reasonable limits, the prosecution is entitled to present its case through evidence it deems most appropriate." *See United States v. Collins*, 368 F. App'x 517, 523 (5th Cir. 2010) (per curiam) (unpublished) (citing *Old Chief*, 519 U.S. at 186–87). There was probative value in the information presented to the jury because it related to Defendants' possible membership in the Texas Syndicate, which was disputed at trial and is still disputed by Defendants on appeal. The risk of unfair prejudice from Defendants appearing in front of the jury without their shirts was also ameliorated by the brevity of the Government's presentation that identified which tattoos were on Velasquez, Cassiano, and Rodriguez before the district court instructed Defendants to put their shirts back on. Moreover, it is difficult to identify which tattoos belong to each Defendant by looking at the photographs that were admitted in evidence. Given the deference required for the abuse of discretion standard of review, the danger of unfair prejudice did

No. 15-51164

not substantially outweigh the probative value of Agent Hause pointing out to the jury the Defendants' tattoos that showed possible Texas Syndicate affiliation.

Even if the district court abused its discretion in requiring Defendants to appear shirtless before the jury, the error was harmless. In a variety of ways, which included testimony from co-conspirators, the Government presented evidence to prove Defendants' Texas Syndicate membership and involvement in the conspiracy. *See Ragsdale*, 426 F.3d at 774–75. The act of requiring Velasquez, Rodriguez, and Cassiano to remove their shirts in this instance was not reversible error.

### 2. Fifth Amendment Privilege Against Self-Incrimination

Defendants additionally argue that the admission of the photographs in evidence that showed their tattoos violated their Fifth Amendment privilege against self-incrimination. Defendants assert that that the presentation of their tattoos was "testimonial" in nature because the photographs of the tattoos were admitted into evidence, not for identification purposes, but rather as substantive evidence of Defendants' affiliation with the Texas Syndicate. Defendants contend that their Fifth Amendment privilege against self-incrimination was violated since the presentation of the tattoos was "testimonial" in character, incriminating, and compelled.

### a.      Standard of Review

Defendants argue for the first time on the appeal that showing the jury their tattoos violated their Fifth Amendment privilege against self-incrimination. Defendants did not object to the photographs of their tattoos being admitted into evidence during either trial. Sanchez argues that he properly preserved error during his trial, but this argument is incorrect. *See Puckett v. United States*, 556 U.S. 129, 135 (2009) ("In federal criminal cases .

27

No. 15-51164

. . parties . . . preserve claims of error: by informing the court—when the court ruling or order is made or sought—of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection.") (quotation marks omitted). At Sanchez's trial, Sanchez's counsel objected to having Sanchez raise the sleeves of his shirt to show the tattoo on his forearm in person to the jury because it violated Rule 403, not the Fifth Amendment. After a bench conference, Sanchez's counsel withdrew his objection, and stipulated that a photograph that the Government admitted in evidence was a photograph of Sanchez's tattoo on Sanchez's forearm.

Accordingly, this issue is reviewed for plain error. *United States v. Krout*, 66 F.3d 1420, 1434 (5th Cir. 1995). Under plain error, we will reverse only where there was (1) error, (2) that was clear or obvious, and (3) that affected Defendants' substantial rights. *United States v. Reagan*, 725 F.3d 471, 491 (5th Cir. 2013). "If those requirements are met, the reviewing court may in its discretion remedy the error only if it (4) seriously affects the fairness, integrity or public reputation of the judicial proceedings." *United States v. Hinojosa*, 749 F.3d 407, 411 (5th Cir. 2014). If the unpreserved error does not meet this demanding plain error standard, the court does not have authority to correct it. *Puckett*, 556 U.S. at 135.

> b.      *Applicable Law and Analysis*

To qualify for the Fifth Amendment privilege against self-incrimination, a communication must be (1) testimonial in character, (2) incriminating, and (3) compelled. *United States v. Hubbell*, 530 U.S. 27, 34 (2000). "[I]n order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information." *Doe v. United States*, 487 U.S. 201, 210 (1988). "The prohibition of compelling a man in a criminal court to be a witness against himself is a prohibition of the use of physical or moral

No. 15-51164

compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material." *Schmerber v. California*, 384 U.S. 757, 763 (1966) (quoting *Holt v. United States*, 218 U.S. 245, 252–53 (1910)). If a tattoo is simply relied upon to identify a defendant, then the Fifth Amendment privilege against self-incrimination is not offended. *See Tasco v. Butler*, 835 F.2d 1120, 1124 (5th Cir. 1988).

In *Holt*, the Supreme Court stated that, "the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material." 218 U.S. at 252–53. The Supreme Court further held in *Schmerber* that the withdrawal of the defendant's blood and the subsequent admission of the chemical analysis to show the percent by weight of alcohol in his blood that proved his guilt was not communicative or testimonial nature. 384 U.S. at 761. The blood test evidence, although a possibly incriminating product of compulsion when the defendant submitted the blood sample, was not seen to violate the Fifth Amendment privilege against self-incrimination because it was neither the defendant's testimony nor evidence relating to some communicative act or writing. *Id.* at 765. In *Hubbell*, the Supreme Court reiterated the proposition that although an act may offer incriminating evidence, a criminal defendant may be required to "put on a shirt, to provide a blood sample or handwriting exemplar, or to make a recording of his voice. The act of exhibiting such physical characteristics is not the same as a sworn communication by a witness that relates either express or implied assertions of fact or belief." 530 U.S. at 35.

Here, the showing of Defendants' tattoos is analogous to physical evidence unprotected by the Fifth Amendment rather than being testimonial in character. *See Holt*, 218 U.S. at 252–53. All of the information that gave

29

No. 15-51164

interpretation to the meaning of Defendants' tattoos was conveyed through the testimony of Agent Hause and other Texas Syndicate members, not Defendants. The Fourth Circuit unequivocally held in a per curiam unpublished opinion that when photographs of a defendant's tattoos are offered as substantive evidence of a defendant's affiliation with a gang the "tattoos are a physical trait, similar to his voice or handwriting, and therefore do not constitute testimony, within the meaning of the Fifth Amendment." *United States v. Toliver*, 387 F. App'x 406, 417 (4th Cir. 2010) (per curiam) (unpublished).

This court recognizes that an argument can be made that the showing of Defendants' tattoos was testimonial in character. A distinction can be drawn from the tattoos being used as an identifying characteristic similar to the usage of a handwriting exemplar, voice exemplar, or a scar on the defendant's body. *See Gilbert v. California*, 388 U.S. 263, 266–67 (1967); *United States v. Greer*, 631 F.3d 608, 613 (2d Cir. 2011) (holding that the defendant's "Tangela" tattoo was testimonial because it tended to prove that the defendant had a relationship with a person named Tangela Hudson). The content and substance of the pictures and words the tattoos contained were used to confirm Defendants' alleged affiliation with the Texas Syndicate. While showing Defendants' tattoos may be implicitly testimonial in nature, the closeness of this issue shows that there was not a "clear" or "obvious" error made by the district court. *See Puckett*, 556 U.S. at 135. Accordingly, there was no plain error by the district court.

Assuming that Defendants' tattoos are testimonial in character and incriminating, the presentation of Defendants' tattoos was by no means "compelled" testimonial evidence protected by the Fifth Amendment. In *Greer*, the Second Circuit held that because officers were able to read a tattoo without

30

No. 15-51164

applying any physical force and because getting the tattoo was "not the product of government compulsion . . . . [the] Fifth Amendment claim fails." 631 F.3d at 613. That court relied on *Fisher v. United States*, 425 U.S. 391 (1976), in which the Supreme Court held that where preparation of subpoenaed papers "'was wholly voluntary,' they could not 'be said to contain compelled testimonial evidence.'" *Id.* (quoting *Fisher*, 425 U.S. at 410)). Defendants' decision to place the Texas Syndicate tattoos on their bodies was wholly voluntary and not a product of compulsion asserted by the Government. Defendants' tattoos were also on places on their bodies that are characteristically highly likely to be visible. *See Toliver*, 387 F. App'x at 418 (stating that the defendant's gang affiliated tattoos on his neck, hands, leg, and arms were outside of Fifth Amendment protection because of being an openly physical characteristic "easily visible when he was wearing a tee-shirt"); *Greer*, 631 F.3d at 613.

Additionally, the Government did not rely on Defendants' truth-telling to prove the existence of the tattoos, or explain how the tattoos affiliated Defendants with the Texas Syndicate. *See Fisher*, 425 U.S. at 410–11. Defendants were not required to restate, repeat, or affirm the truth of Agent Hause statements that explained to the juries in both trials that Defendants had tattoos indicative of Texas Syndicate membership. *See id.* at 409. Allowing evidence of Defendants' tattoos to be presented did not constitute error, much less plain error by the district court.

## C. Jury Charge Instructions

Velasquez, Rodriguez, and Cassiano raise that the district court committed reversible error by failing to give (1) accomplice witness testimony and use of addictive drugs instructions and (2) an instruction relating to Sanchez's severance from Defendants during the first trial in the jury charge.

No. 15-51164

Neither of these arguments are persuasive, and there was no error by the district court.

### 1. Accomplice Witness and Use of Addictive Drugs Instructions

This issue regarding whether the trial court erred by not giving the accomplice witness and use of addictive drugs instructions is moot. Rodriguez acknowledges this outcome and retracted his argument that his convictions should be reversed on this ground in his reply brief. In the initial record on appeal, pages five and six of the jury charge, which contained the accomplice-witness testimony and use of addictive drugs instructions were not included. The record on appeal has now been supplemented to include all of the pages of the jury charge, which contain both jury instructions.

### 2. Instruction of Sanchez's Severance

Rodriguez, Velasquez, and Cassiano argue that the district court committed reversible error when it did not give an instruction relating to Sanchez's severance. Rodriguez, Velasquez, and Cassiano state that the district court's failure to give a jury instruction regarding Sanchez's absence possibly left the jury with room to speculate that Sanchez entered into a guilty plea or some other arrangement that implicated them.

### a.      Standard of Review

Cassiano, Rodriguez, and Velasquez argue that Rodriguez's trial counsel properly objected to the exclusion of the instruction relating to Sanchez's severance so this issue should be reviewed for abuse of discretion rather than for plain error. This court disagrees. In the tedium of the exchange between the district court and Rodriguez's trial counsel lies pointed proof that there was no objection to how the district court decided to address Sanchez's severance from Defendants. The district court told all of the parties after severing Sanchez from the proceedings, "I'm going to tell [the jury] to just consider the

32

No. 15-51164

defendants before them and not anybody else." To this statement Rodriguez's trial counsel responded, "That's what I was asking, Your Honor."[10] The district court's charge to the jury included just what the district court said it would include—it told the jury that "[t]he government has the burden of proving each defendant guilty beyond a reasonable doubt, and if it fails to do so, you must acquit that defendant." Notably, neither a proposed jury instruction nor an objection was made about the lack of a specific jury instruction referencing Sanchez's severance during the charge conference. Accordingly, this issue will be reviewed for plain error. *See* Fed. R. Crim. P. 30(d).

---

[10] The exchange precisely went as follows:

> **The Court**: All right, gentlemen, all parties are present now, including the defendants that the Court just called. Mr. Sanchez's case is being severed from this one to be retried in the month of September. There has – a conflict has arisen that requires retrial of Mr. Sanchez. So the only three defendants left at this point are Mr. Rodriguez, Mr. Cassiano, and Mr. Velasquez. Is everybody ready to receive the jury and proceed?
> **The Government**: Yes, Your Honor.
> **Cassiano's trial counsel**: Yes, Your Honor.
> **Velasquez's trial counsel**: Yes, Your Honor.
> **Rodriguez's trial counsel**: Yes, Your Honor.
> **The Court**: All right, let's bring them in.
> **Rodriguez's trial counsel**: Your Honor, and – I apologize.
> **The Court**: Hold on.
> **Rodriguez's trial counsel**: Will there be an instruction given to the jury or . . . .
> **The Court**: I can – I can tell them that the case has been severed, but I'm not going to tell them why. I mean, I – I'm going to just tell them to – when it comes to the final charge – the charge, I'm going to tell them is to just consider the defendants before them and not anybody else.
> **Rodriguez's trial counsel**: Yes, Your Honor.
> **The Court**: Is that what you were asking, Mr. Juarez?
> **Rodriguez's trial counsel**: That's what I was asking, Your Honor.

No. 15-51164

b.      *Applicable Law and Analysis*

In some instances it is necessary for a trial court to explain a co-defendant's absence. *United States v. Ramos-Cardenas*, 524 F.3d 600, 611 (5th Cir. 2008). "Ordinarily, when the jury learns of a codefendant's guilt for the same or similar offenses, and the defense counsel does not request that curative instruction be given, the failure of the trial judge to give one will not require reversal." *United States v. DeLucca*, 630 F.2d 294, 299 (5th Cir. 1980). Some factors that the district court may consider when determining if there is a need for a curative instruction because of a co-defendants dismissal are: the way in which the dismissal is brought to the jury's attention, the purpose and motivation for doing so, the emphasis placed on the co-defendant's dismissal relative to the substantive aspects of the case, and the defense counsel's conduct with respect to the trial proceedings—whether defense counsel objected and demanded an instruction, or whether defense counsel refused to do so for tactical reasons. *See id.*

In *DeLucca*, this circuit held that the district court did not commit plain error when it failed to give a curative instruction after the Government moved to dismiss two of the co-defendants in open court in front of the jury on two different occasions. *Id.* at 297. This court held that the district court's instructions to the jury of the presumed innocence of the defendants and emphasis on considering the evidence separately as to each defendant was sufficient despite the absence of a curative instruction. *Id.* at 299–300. Additionally, this court noted that because there was no intemperance by the judge and the record failed to indicate that the judge or the prosecutor did anything to adversely influence the jury, there was no plain error. *Id.*

Here, the district court's charge instructed the jury the way it said it would, and more, by telling the jury (1) to consider the evidence separately as

34

No. 15-51164

to each defendant, (2) that the Defendants were presumed innocent until proven guilty beyond a reasonable doubt by the evidence presented, and (3) not to consider the fact that an accomplice has entered a guilty plea to any offense as evidence of the guilt of any other person. The record also did not reveal that either the district court or the prosecutor adversely influenced the jury in any way to prejudice Defendants. This was not plain error. *See Reagan*, 725 F.3d at 491.

### D. The District Court's Failure to *sua sponte* Sever Velasquez

Velasquez avers that he was prejudiced by the district court not severing his case from Rodriguez and Cassiano to be retried separately at a later date, and this decision constituted reversible error. This court is not convinced by Velasquez's argument.

#### 1. *Standard of Review*

The decision of the district court not to *sua sponte* sever Velasquez from the trial to be retried separately at a later date will be reviewed for plain error because Velasquez did not move to sever his case or object to being tried with Defendants. To establish plain error, Velasquez must show an error is clear or obvious and affects his substantial rights. *United States v. Prieto*, 801 F.3d 547, 549–50 (5th Cir. 2015) (per curiam). If the preceding requirements are met, the reviewing court may in its discretion remedy the error only if the error "seriously affects the fairness, integrity or public reputation of the judicial proceedings." *Id.*

#### 2. *Applicable Law and Analysis*

"[T]he mere presence of a spillover effect does not ordinarily warrant severance." *United States v. Pofahl*, 990 F.2d 1456, 1483 (5th Cir. 1993). Moreover, the trial court instructed the jury to limit all the evidence to the appropriate defendant. "[J]uries are presumed to follow their instructions."

35

No. 15-51164

*United States v. Cessa*, 785 F.3d 165, 183 (5th Cir. 2015) (quoting *Zafiro v. United States*, 506 U.S. 534, 540 (1993)). The jury is determined to have accordingly been able to separate the evidence and properly applied it to each Defendant, including Velasquez. The other murders and the activities relating to drug distribution are also probative towards the racketeering acts that the Texas Syndicate conducted during Velasquez's membership and to the overall criminal objectives of the gang. *See United States v. Ballis*, 28 F.3d 1399, 1409 (5th Cir. 1994). The district court did not commit plain error by permitting Velasquez's case to be tried with Defendants.

### E. Velasquez's Ineffective Assistance of Counsel Claim

Velasquez argues that his trial counsel provided ineffective assistance because he failed to present evidence that Velasquez had abandoned or withdrawn from the conspiracy after Velasquez was arrested in 2006. "Sixth Amendment claims of ineffective assistance of counsel should not be litigated on direct appeal, unless they were previously presented to the trial court." *Isgar*, 739 F.3d at 841 (quoting *United States v. Aguilar*, 503 F.3d 431, 436 (5th Cir. 2007) (per curiam)). It is only in "rare cases in which the record allows a reviewing court to fairly evaluate the merits of the claim" that the court will consider this issue on direct appeal. *Id.* This is not one of those rare cases in which the record permits the court to fairly evaluate the merits of the claim on direct appeal. Because there was no hearing before the district court, the record fails to provide sufficient detail about counsel's conduct for this court to fairly evaluate Velasquez's claim. *See Aguilar*, 503 F.3d at 436. Velasquez's appeal on this ground is denied without prejudice to collateral review.

### F. Velasquez's Sentence

Velasquez argues that the district court did not properly sentence him because he did not kill De La Garza, and the district court improperly punished

36

No. 15-51164

him for invoking his right to a trial by jury. The Government and Velasquez agree that Velasquez's sentence should be reviewed for plain error because Velasquez did not object to his Presentence Investigation Report (PSR) in the district court. Velasquez must show an error that is clear or obvious that affects his substantial rights to establish plain error. *See Prieto*, 801 F.3d at 549–50. If Velasquez does this, then the court has discretion to correct the error if it seriously affects the fairness, integrity or public reputation of the judicial proceedings. *Id*.

Velasquez was sentenced to a term of life imprisonment for his convictions under RICO, § 1962(d) and VICAR, § 1959(a)(1), murder in aid of racketeering. As recounted earlier in this opinion, there is sufficient evidence to support these convictions. Section 1959 explicitly states that an individual convicted under § 1959(a) "shall be punished . . . by death or life imprisonment." 18 U.S.C. § 1959(a). Velasquez's murder in aid of racketeering conviction means he was convicted under the Texas state murder statute or federal law. The commentary to § 2E.1.3 states that "if the underlying conduct violates state law, the offense level corresponding to the most analogous federal offense is to be used." U.S.S.G. § 2E1.3, cmt. 1. Velasquez's PSR calculated Velasquez's sentence in reference to the first-degree murder guideline in the U.S. Sentencing Guidelines (U.S.S.G) § 2A1.1. The district court adopted the PSR's calculations with no objections from Velasquez. The district court correctly applied the Guidelines. *See* U.S.S.G. § 2A1.1.

In Texas, an individual commits a murder if that person "intentionally or knowingly causes the death of an individual," or "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." V.T.C.A., Penal Code § 19.02. First degree murder under federal law includes, "any . . . willful, deliberate, malicious, and

37

No. 15-51164

premediated killing" or a murder "committed in the perpetration of, or attempt to perpetrate any . . . burglary, or robbery." 18 U.S.C. § 1111; *see also Jones*, 873 F.3d at 500 ("Federal law classifies a broad range of murders as 'first degree' including 'any . . . kind of willful, deliberate, malicious, and premeditated killing.'"). The federal first-degree murder guideline applies to Velasquez's murder conviction. Thus, it was not plain error to apply the first-degree murder guideline, which imposes a life sentence.

Velasquez's allegations that the district court punished him for taking his case to trial are similarly meritless. The district court told Velasquez that because he went to trial and rejected the plea offer, he was faced with the imposition of a term of life imprisonment. This statement by the district court does not equate to inflicting punishment on Velasquez for invoking his right to a trial by jury. *See Gonzales v. Cain*, 525 F. App'x 251, 255 (5th Cir. 2013) (per curiam) (unpublished) (holding that the defendant was not being punished for exercising his right to stand trial when the trial judge "merely recognized that the imposition of an increased sentence after trial is often justifiable since the bargained-for leniency inherent in the plea negotiation process is not available once a trial has been held" (citing *Alabama v. Smith*, 490 U.S. 794, 802–03 (1989))).

### G. Sanchez's Motion for Mistrial

On the last day of testimony for the Government's presentation of its case-in-chief in Sanchez's trial, FBI Agent Katherine Gutierrez ("Agent Gutierrez") testified about the information obtained during the FBI's investigation of the Texas Syndicate in Uvalde. During her testimony, Agent Gutierrez commented on Sanchez's decision not to testify when Sanchez's trial counsel cross examined her. On cross examination, Agent Gutierrez was asked about how her opinion of what she heard differed from what was transcribed

38

No. 15-51164

and translated by a FBI linguist from a telephone call recording admitted in evidence. In response to Sanchez's trial counsel's question, Agent Gutierrez remarked, "I guess your client can get up here and testify. I don't know. . . ."[11] Immediately after Agent Gutierrez's comment, in the presence of the jury, the

---

[11] In detail, this is how the sequence of questions and answers occurred:

    **Sanchez's trial counsel:** In 61-A, you mentioned that "Bug Bug" means actually "Buck Buck?"

    **Agent Gutierrez:** He asked me what I heard, and I told him I heard "Buck Buck." I believe it was being discussed about Buck Buck.

    **Sanchez's trial counsel:** But the sound was Bug Bug. . . .

    **Agent Gutierrez:** That she – she believes – she says "Buck" – "Bug" or "Buck."

    **Sanchez's trial counsel:** And then you say –

    **Agent Gutierrez:** And I say "Buck."

    **Sanchez's trial counsel:** Buck?

    **Agent Gutierrez:** Yes, sir.

    **Sanchez's trial counsel:** Okay. But is that the nickname of a person or . . . .

    **Agent Gutierrez:** I – I – like I said, I do not know that person's full name.

    **Sanchez's trial counsel:** But – but is the –

    **Agent Gutierrez:** Which I already told him.

    **Sanchez's trial counsel:** Well, is the nickname "Buck Buck," I mean, twice?

    **Agent Gutierrez:** I don't know. I don't know the individual. I'm telling you I don't know.

    **Sanchez's trial counsel:** Okay.

    **Agent Gutierrez:** – regarding an individual named Buck or nicknamed Buck. I'm not sure which it is because I don't know the true identity of that individual.

    **Sanchez's trial counsel:** Because in the transcript 61-A it is repeated twice.

    **The Court:** Is there –

    **Sanchez's trial counsel:** Buck Buck.

    **The Government:** Your Honor –

    **Agent Gutierrez:** I guess your client can get up here and testify. I don't know. I –

    **The Court:** Wait.

    **Agent Gutierrez:** I mean –

    **The Court:** Huh-uh, Ms. Gutierrez. No, Ms. Gutierrez. That will be stricken. No.

No. 15-51164

district court stopped the cross examination and gave a curative instruction that Agent Gutierrez's comment would be stricken from the record. Sanchez subsequently unsuccessfully moved for a mistrial because of Agent Gutierrez's statements.

### 1. Standard of Review

This court reviews the denial of a motion for mistrial for abuse of discretion. *United States v. Zamora*, 661 F.3d 200, 211 (5th Cir. 2011). If a defendant moves for a mistrial on the grounds that the jury heard prejudicial testimony, "a new trial is required only if there is a significant possibility that the prejudicial evidence has a substantial impact upon the jury verdict, viewed in light of the entire record." *Id.* (quoting *United States v. Paul*, 142 F.3d 836, 844 (5th Cir. 1998)).

### 2. Applicable Law and Analysis

"A prosecutor is prohibited from commenting directly or indirectly on a defendant's failure to testify." *United States v. Ramey*, 531 F. App'x 410, 413 (5th Cir. 2013) (per curiam) (unpublished) (quoting *United States v. Wharton*, 320 F.3d 526, 538 (5th Cir. 2003)); *see also Doyle v. Ohio*, 426 U.S. 610, 618–19 (1976). A prosecutor's or witness's remarks constitute a comment on a defendant's silence in violation of the Fifth Amendment if the manifest intent was to comment on a defendant's silence, or if the character of the remark was such that the jury would naturally and necessarily construe the remark to be a comment on a defendant's silence. *Wharton*, 320 F.3d at 538. Comments made by a witness about the decision of a defendant not to testify are reviewed in context. *See United States v. Rocha*, 916 F.2d 219, 232 (5th Cir. 1990). Part of reviewing the remarks in context is determining whether the remark was spontaneous or prompted by the prosecutor. *United States v. Moreno*, 185 F.3d 465, 472–73 (5th Cir. 1999). "That the prosecution may not have intended that

40

No. 15-51164

the witness make such a comment neither absolves the sin nor eliminates any potential prejudice." *United States v. Espinosa-Cerpa*, 630 F.2d 328, 335 (5th Cir. 1980).

"If we find an error, we apply the doctrine of harmless constitutional error by reviewing the record to determine whether the error was harmless beyond a reasonable doubt." *Moreno*, 185 F.3d at 472. A comment will not warrant reversal if, beyond a reasonable doubt, it did not contribute to the verdict. *Id.* at 475. "[A] curative instruction can militate against finding a constitutional violation, or become central to the harmless error analysis." *Ramey*, 531 F. App'x at 414.

Here, although the Agent Gutierrez's remark was uninvited by the Government, it constituted a constitutional violation. Agent Gutierrez's spontaneous statement would have naturally been interpreted by the jury as a comment regarding Sanchez's failure to testify. *See Wharton*, 320 F.3d at 538 ("The test for determining if a constitutional violation has occurred is whether 'the language was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'").

Our analysis, however, does not conclude here; we must determine if the constitutional violation was harmless. *See Moreno*, 185 F.3d at 474. "An error is harmless only if we can determine beyond a reasonable doubt that the improper testimony did not contribute to the jury's verdict." *See id.* at 475 (holding that even though there was a constitutional error that there was no abuse of discretion in denying the motion for a mistrial). Importantly, the court immediately gave a curative instruction after Agent Gutierrez's remark about Sanchez. *See id.* at 474. The "Bug Bug," "Buck Buck" discrepancy that incited Agent Gutierrez's inappropriate comment was also only a minor part in the

41

No. 15-51164

grand scheme of overwhelming evidence presented to establish Sanchez's guilt.

Additionally, the statement made by Agent Gutierrez was isolated, unsolicited,

and never highlighted in the prosecution's subsequent questioning or closing

argument. *See, e.g, Espinosa-Cerpa*, 630 F.2d at 335. Although there was a

constitutional error, such error was harmless. The district court did not abuse

its discretion in denying Sanchez's motion for a mistrial.[12] *See Moreno*, 185

F.3d at 475.

### H. Failure to Transcribe Sanchez's Severance Conference

Velasquez and Rodriguez, who have new appellate counsel that did not

participate in the trial, argue that because the conference discussing the

substance of the conflict that caused Sanchez's severance is missing, this case

should be reversed and remanded for a new trial. As an alternative to reversing

the ruling, Rodriguez argues that this case should be remanded so that the

record on appeal can be reconstructed.[13]

This court acknowledges that when "a defendant is represented on

appeal by counsel other than the attorney at trial, the absence of a substantial

and significant portion of the record, even absent any showing of specific

---

[12] Sanchez argues that the cumulative error doctrine applies to his appeal, and calls
for a reversal of his convictions. "The cumulative error doctrine provides that an aggregation
of non-reversible errors (*i.e.*, plain errors failing to necessitate reversal and harmless errors)
can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United
States v. Delgado*, 672 F.3d 320, 344 (5th Cir. 2012) (quoting *United States v. Munoz*, 150
F.3d 401, 418 (5th Cir. 1998)). Given the lack of even harmless errors, this doctrine is
inapplicable to Sanchez's appeal. *See id.*

[13] In a supplemental letter to the court after oral argument, Rodriguez acknowledges
that he abandons his request to remand to reconstruct the record on appeal regarding
Sanchez's severance. In lieu of remanding this appeal to reconstruct the record, the
Government and Rodriguez jointly stipulated to supplement the record on appeal with the
reason for the conflict that caused Sanchez's case to be severed from Defendants to be retried
separately at a later date.

No. 15-51164

prejudice or error, is sufficient to mandate reversal." *United States v. Aubin*, 87 F.3d 141, 149 (5th Cir. 1996) (quoting *United States v. Neal*, 27 F.3d 1035, 1044 (5th Cir. 1994)). However, not all failures to record what has occurred during the trial will work a reversal. *United States v. Guess*, 134 F.3d 368, 368 (5th Cir. 1997) (per curiam) (unpublished). "[A] gapless transcription of a trial is not required." *Delgado*, 672 F.3d at 343. The conclusion that the missing portion of the record is significant and substantial must be more than a speculative assertion. *Aubin*, 87 F.3d at 149–50.

In *United States v. Gieger*, this court held that the absence of seventy-two bench conferences, which was the majority of the bench conferences from the trial, did not constitute a significant and substantial missing portion of the record. 190 F.3d 661, 667 (5th Cir. 1999). Also, a defendant's speculation that a bench conference constituted a substantial and significant portion missing from the record has proved to be inadequate grounds for reversal. *See Aubin*, 87 F.3d at 149–50. In *Aubin*, the defendant, who was represented on appeal by new counsel, speculated that nine bench conferences missing from the record which "may have covered everything from 404(b) decisions to *Brady* decisions" were a "substantial and significant portion of the record." 87 F.3d at 149–50; *see also* Brief of Appellant at 95, *United States v. Aubin*, 87 F.3d 141 (5th Cir. 1997). This court held that since the defendant did not make any attempt to determine the substance of the bench conferences, and rather only speculated the substance, the missing portion of the record was not substantial and significant. *Aubin*, 87 F.3d at 149–50.

Here, the supplemental letter and joint stipulation made after oral argument regarding the reason for the conflict that caused Sanchez's severance revealed that the conflict was not harmful to Velasquez's or Rodriguez's case. Additionally, this one conference missing from the record does not come close

No. 15-51164

to the seventy-two bench conferences missing from the record in *Gieger* where this court determined that there was not a substantial and significant portion of the record missing. 190 F.3d at 667. In conclusion, Defendants' arguments do not indicate that there is a substantial and significant omission from the record on appeal. Reversal or remand is not warranted.

### III.   CONCLUSION

For the foregoing reasons, we AFFIRM Defendants-Appellants' convictions and sentences.

44